# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8013 | **DATE** | 8/8/2003 |
| **CASE TITLE** | John P. Sheehan, IV, et al. vs. United States of America | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)   ☐   Filed motion of [ use listing in "Motion" box above.]

(2)   ☐   Brief in support of motion due _____.

(3)   ☐   Answer brief to motion due_____ . Reply to answer brief due_____ .

(4)   ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)   ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)   ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)   ☐   Trial[set for/re-set for] on _____ at _____.

(8)   ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)   ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10)   ■   [Other docket entry]   Enter Memorandum Opinion and Order.  The court enters judgment is entered in favor of Plaintiff and against the United States and awards damages in the amount of $2,468,000.

(11)   ■   [For further detail see order attached to the original minute order.]

|   | |   | **Document Number** |
|---|---|---|---|
|   | No notices required, advised in open court. | | |
|   | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
|   | Notified counsel by telephone. | AUG 11 2003 | |
|   | Docketing to mail notices. | | |
|   | Mail AO 450 form. | | |
|   | Copy to judge/magistrate judge. | | |
| ETV | courtroom deputy's initials | | |

U.S. DISTRICT COURT
CLERK
8/8/2003

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN P. SHEEHAN, IV, as Independent )
Executor of the Estate of JOHN P. )
SHEEHAN, III, Deceased, )
                       )
         Plaintiff, )
                       )
         v. )     No. 00 C 8013
                       )
UNITED STATES OF AMERICA, )     Judge Rebecca R. Pallmeyer
                       )
         Defendant. )

DOCKETED

AUG 1 1 2003

## MEMORANDUM OPINION AND ORDER

This lawsuit arises from a tragic traffic accident that claimed the life of 62-year-old John P.

Sheehan, III ("Sheehan"). On November 2, 1999, Sheehan was hit and fatally injured by a United

States Postal Service truck as he was attempting to cross Des Plaines Avenue in Forest Park,

Illinois. On December 22, 2000, Sheehan's oldest son John filed a two-count complaint against

the United States on behalf of his father's estate. Plaintiff's complaint, under the Federal Tort

Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, alleges that the driver of the postal truck,

James Lloyd, was negligent in failing to observe and avoid Sheehan as he crossed the street.

Defendant United States concedes that Lloyd was acting within the scope of his employment with

the United States Postal Service, but denies liability, urging that the evidence does not show that

Lloyd acted negligently.

For the reasons discussed below, the court finds in favor of Plaintiff.

## BACKGROUND[1]

The parties do not dispute that John Sheehan died as a result of the injuries he sustained

from being run over by the postal truck driven by James Lloyd on November 2, 1999, or that Lloyd

---

[1]     The facts presented in this section were compiled from a four day bench trial held
before the court on May 1-2, and July 1-2, 2002.

was acting within the scope of his employment. (Defendant's Proposed Findings of Fact and Conclusions of Law, (hereinafter, "D.F."), ¶¶ 9, 132.) Instead, the parties dispute whether Lloyd's failure to observe Sheehan under the circumstances was negligent and whether Sheehan was negligent himself in the manner he attempted to cross Des Plaines Avenue.

John Sheehan was 62 years of age when he died. (D.F. ¶ 124.) At the time of his death, Sheehan was in good health and had a life expectancy of 18.2 years. (D.F. ¶ 124.) He grew up on the south side of Chicago before leaving for college at the U.S. Military Academy at West Point. (Trial Transcript, (hereinafter, "T.T."), at 291-92, 308.) After graduating from West Point in 1959, Sheehan married Lois, his girlfriend of five years, and began a career in the military. (*Id.* at 294.) Sheehan and Lois have seven children; the oldest was born in 1960 and the youngest in 1971. (*Id.*) It is undisputed that Sheehan enjoyed a loving and healthy relationship with his wife and that he was respected and loved by all of his adult children. (D.F. ¶¶ 127-128.) Sheehan's family members described him in vivid terms as a source of strength who is greatly missed by his widow and children.

**The Setting**

The accident that led to Sheehan's death occurred while he was attempting to cross Des Plaines Avenue just south of its intersection with the exit ramp leading from the I-290 expressway in Forest Park, Illinois. (D.F. ¶ 1; Plaintiff's Proposed Findings of Fact and Conclusions of Law, (hereinafter, "P.F."), ¶ 2.) Before addressing the evidence pertaining to the accident, the court pauses to describe the configuration of the five-way intersection where the accident occurred.

Des Plaines Avenue is a four lane road running generally north and south with two lanes for northbound traffic and two lanes for southbound traffic.[2] ((D.F. ¶¶ 1, 3, 5; Aerial Photograph

---

[2]     The court has attached an aerial photograph of the intersection, Plaintiff's exhibit 1, to this opinion to provide the reader with a better perspective of the accident scene.   In addition,
(continued...)

of the Intersection of I-290 and Des Plaines Avenue, Plf.'s Ex. 1.) The I-290 exit ramp intersects the west side of Des Plaines Avenue and only carries traffic headed east from the I-290 expressway. (Id.) At the end of the exit ramp, before traffic enters the intersection, the exit ramp has three lanes that direct traffic in one of three directions: north, east, and south. (Id.) Dunlop Street and Harrison Street both intersect on the east side of Des Plaines Avenue and both are two lane, two-way streets. (D.F. ¶ 4; Plf.'s Ex. 1.) Dunlop Street intersects with Des Plaines Avenue diagonally from the southwest and Harrison Street intersects directly opposite the I-290 exit ramp. (Id.) For purposes of this case, the court is most concerned with the intersection created by the I-290 exit ramp and Des Plaines Avenue where this accident took place.

The southwest corner of the intersection, created by Des Plaines Avenue and the I-290 exit ramp, is irregular because it does not form a 90 degree angle. (Plf.'s Ex. 1.) A driver turning south from the exit ramp onto Des Plaines Avenue must make a much sharper turn than 90 degrees.[3] (Id.) In addition, three posts stand south of the I-290 exit ramp along the west side of Des Plaines Avenue near the southwest corner of the intersection. (D.F. ¶ 6; Plf.'s Ex. 1.) Two of these posts support traffic lights; one of these lights regulates traffic headed east from the exit ramp (marked as Traffic Light A) and the other regulates traffic heading south on Des Plaines Avenue (marked as Traffic Light B). (Id.) A street lamp post stands on the corner between the two traffic lights (marked as Light Post C), and a chain link fence, approximately six feet high, runs adjacent to and south of the I-290 exit ramp and continues further adjacent to and west of Des Plaines Avenue (marked as Fence D). (Id.) Bushes partially line a portion of the chain link fence that is adjacent to the exit ramp. (Plf.'s Ex. 1.) Sidewalks also run adjacent to both sides of Des Plaines Avenue

---

[2](...continued)
the court has marked the relevant landmarks, which are described below.

[3]    Judging from aerial photographs of the scene, the court estimates the angle of the right turn at 70 degrees.

(marked as Sidewalks E and F) and Dunlop Street (marked as Sidewalks G and H), but there is no sidewalk on either side of the exit ramp. (*Id.*) Further, although there are painted crosswalks over four of the five streets that make up this intersection, there is no marked crosswalk for pedestrians traveling from the southwest corner of the exit ramp and Des Plaines Avenue to the southeast corner of Des Plaines Avenue and Dunlop Street. (*Id.*)

**The Accident**

The parties agree that on November 2, 1999, at approximately 2:15 p.m., James Lloyd had exited the I-290 expressway in his postal truck and was stopped at the traffic light, waiting to turn south onto Des Plaines Avenue toward the bulk mail center at 7400 West Roosevelt Road in Forest Park. (D.F. ¶¶ 9, 11; P.F. ¶ 1,14.) The truck Lloyd was driving was a 20-foot-long Mac tractor, with an automatic transmission, pulling a 45 foot long trailer, owned by the United States Postal Service. (D.F. ¶ 9; P.F. ¶ 1.)

At the same time, Sheehan, a pedestrian, was standing south of the southwest corner of Des Plaines Avenue and the I-290 exit ramp, waiting for the same light to change before crossing Des Plaines Avenue. (D.F. ¶ 10.) Sheehan was in the process of walking from a nearby Chicago Transit Authority El station to his car, which was parked on Dunlop Street. (*Id.*) When the light changed, Lloyd started to make his right turn onto Des Plaines Avenue, which required him to first pull straight ahead to avoid hitting the light post (Light Post C), located just south of the of the exit ramp, with his trailer. (D.F. ¶ 20.) At approximately the same time, Sheehan began to cross the street, but at some point, for an undetermined reason, Sheehan fell to the pavement in the southbound lanes of Des Plaines Avenue and was unable to get back to his feet. (D.F. ¶¶ 40-42; P.F. ¶¶ 20, 26, 27.) Lloyd never saw Sheehan. (D.F. ¶ 25; P.F. ¶ 27.) He completed his right turn and in the process ran over Sheehan with the left front tires of the postal truck. (*Id.*) Soon after hitting Sheehan, Lloyd became aware that he had hit a pedestrian and stopped his truck. (D.F.

4

**Witness Testimony**

At the time of the accident, Demetrius Brass, a diesel truck technician, was driving in the opposite lane northbound on Des Plaines Avenue just south of its intersection with the I-290 exit ramp. (T.T. at 76.) Brass was very familiar with the intersection because he lived in Forest Park and traveled through the intersection twice a day on his way to and from work. (*Id.* at 76-77.) Brass testified that he had regularly observed pedestrians in the area, crossing Des Plaines Avenue from west to east, similar to Sheehan's intended path. (*Id.* at 76-77, 92.) From his position, second in line in the center northbound lane, (*id.* at 79, 82), Brass could see Sheehan, standing on the west side of Des Plaines Avenue, just south of the southwest corner formed by the exit ramp and Des Plaines Avenue. (*Id.* at 92.) Brass also saw postal truck stopped in the right-hand turning lane of the exit ramp, also waiting for the light to change. (*Id.* at 84-85.)

When the light changed for the postal truck, Brass recalled, the truck first drove straight ahead. (*Id.*) At the same time, Sheehan started to walk across the street at what Brass described as a "slight angle" (presumably in the direction of the southeast corner of Dunlop and Des Plaines Avenue). (*Id.*) While the truck was still pulling forward, before beginning its turn, Brass saw Sheehan fall to the ground in the middle of the southbound lanes of Des Plaines Avenue for no apparent reason. (*Id.* at 94.) Sheehan fell so suddenly that he did not have time to put his hands out to break his fall, and he came to rest lying on his stomach between the two southbound lanes of Des Plaines Avenue, his feet pointed towards the curb and his head closer to the double yellow lines dividing the northbound and southbound lanes of Des Plaines Avenue. (*Id.*) Brass testified that after falling, Sheehan did not immediately get up, but instead was able only to roll over onto his side, so that he was facing north, in the direction of the oncoming postal truck. (*Id.* at 86.)

Brass recalled that at the time Sheehan fell, the truck was almost in the northbound lanes

of Des Plaines Avenue, because it needed to "swing out" before making its sharp turn into the southbound lanes of Des Plaines Avenue. (*Id.* at 78.) Brass realized that the truck driver did not see Sheehan lying in the street and that the truck was on a course to run Sheehan over. (*Id.*) In an effort to warn the driver, Brass began to honk his horn and flash his headlights. (*Id.*) These attempts failed to get the driver's attention, however, and the truck ran over Sheehan where he had fallen in the southbound lanes. (*Id.* at 78, 88.) Brass was unable to estimate the amount of time that passed from when Sheehan fell until the truck hit him, nor could he determine the truck's rate of speed.[4] (*Id.* at 86, 95.) After the initial impact, Brass got out of his car and attempted to get the driver's attention by striking the driver's door and yelling until Lloyd stopped the truck. (*Id.* at 90.) Brass recalled that Lloyd was initially in disbelief when Brass explained what had happened. (*Id.*)

Once the truck had stopped, Brass approached Sheehan and attempted to speak with him as he lay on the road under the truck. (*Id.* at 91.) Sheehan was initially responsive: Brass asked him whether he understood that he had been hit by a truck and Sheehan nodded affirmatively. (*Id.*) Brass testified that Sheehan attempted to speak, but could only mumble; his attempt to get up from the street was also unsuccessful. (*Id.* at 91.) Within a few minutes, paramedics arrived and found Sheehan unresponsive.[5] (Loyola EMS System Ambulance Report, Def.'s Ex. 10, at 1; P.F. ¶ 35; D.F. ¶ 73.) The paramedics transported Sheehan to Loyola University Medical Center in Maywood, Illinois, for treatment, arriving there at 2:29 p.m. (Loyola EMS System Ambulance Report, Def.'s Ex. 10, at 1, 3, Emergency Department Record, Def.'s Ex. 11, at 7.) Sheehan was pronounced

---

[4]     Brass testified that Sheehan's coat was first caught by the bumper of the truck and then Sheehan was spun around before his head was run over by the right front tires of the postal truck. (T.T. at 90.) The court notes, however, that there is no other evidence that Sheehan was hit by the right tires; instead, as described below, there is overwhelming evidence that Sheehan made contact with the left front tires of the truck.

[5]     The record is unclear regarding the exact time the paramedics arrived, but it had to be after the accident took place at 2:15 p.m. and before Sheehan arrived at the hospital at 2:29 p.m..

dead at 2:59 p.m. (*Id.*)

Michael Alaska, an electrician from Stickney, Illinois, was also driving through the intersection at the time of the accident. (*Id.* at 17.) In his 1987 Ford Bronco II, Alaska exited the I-290 expressway behind the postal truck driven by Lloyd. (*Id.*) As he drove east down the exit ramp toward the intersection, Alaska saw Sheehan standing south of the exit ramp and south of the light on Des Plaines Avenue. (*Id.* at 20, 28.) Because Alaska's view was blocked by bushes and the chain link fence (Fence D) that lined the south side of the exit ramp, he could see Sheehan only for a moment. (*Id.*) Once Alaska was stopped behind the postal truck, Sheehan was no longer visible to him. (*Id.*)

When the light changed, Alaska observed the truck starting to move forward, into the middle lane, which is dedicated to forward-only traffic, and then, soon after completing its turn, come to a sudden stop. (*Id.* at 25.) At the point it stopped, the truck was far enough away from the curb for Alaska to make a sharp turn between the truck and the western curb of Des Plaines Avenue. (*Id.*) As he passed the postal truck, Alaska saw Sheehan, lying in the fetal position with blood on his body. (*Id.* at 24.) Alaska parked his car on a side street, and returned to the scene, where he observed that Sheehan was still in the fetal position with blood around him and that the truck driver was "shook up." (*Id.* at 22-23.) Alaska observed blood on the tires of the truck and on the street, but not on the front of the truck. (*Id.* at 26.)

At approximately the same time, Lawdrena Zellers was driving west on Harrison Street, intending to make a left turn onto Des Plaines Avenue. (D.F. ¶ 60.) Zellers saw no pedestrians as she made her turn, (*id.* ¶¶ 62-64), but she did hear horns blowing. (P.F. ¶ 30.) Because the postal truck had moved into the center southbound lane of Des Plaines Avenue, Zellers was initially unable to complete her left turn. (D.F. ¶ 64.) From this position, as she waited for the intersection to clear, Zellers could see something underneath the truck. (*Id.* ¶ 65.) She then drove her car to

7

the outside southbound lane and completed her turn by going around the postal truck. (*Id.* ¶ 66.) Zellers did not see the truck make contact with Sheehan, but as she passed the truck, Zellers saw Sheehan lying on the ground moving in a way she described as the movement of someone struggling to swim. (*Id.* ¶¶ 67, 68.) She pulled over a half block south of the truck and used her cellular phone to report the accident to the Forest Park Police Department, before proceeding on her trip to work. (*Id.* ¶ 70.)

## Lloyd's Testimony

James Lloyd, the driver of the postal truck, began driving trucks for private firms in 1954 and, since 1984, had been a tractor trailer operator with the United States Postal Service. (*Id.*) Lloyd was very familiar with the intersection where the accident occurred because he made frequent runs to the bulk mail center, requiring him to travel through the intersection. (*Id.* at 101.) Lloyd testified that, prior to the day of the accident, he had "occasionally" seen pedestrians in the intersection crossing Des Plaines Avenue from the southwest corner to the southeast corner. (*Id.* at 123-24.) He testified, further, that on the day of the accident, his view south down Des Plaines Avenue was obstructed by the posts (Light Post C and Traffic Lights A and B) and the chain link fence (Fence D), but not by the bushes. (*Id.* at 111-12.) He explained, without further elaboration, that from the driver's seat of his truck it is harder to see things which are "below eye level." (*Id.* at 131.)

Lloyd described the difficulties of the turn he was making in some detail. He noted the post just south of the exit ramp (Lamp Post C), near the southwest corner of Des Plaines Avenue. (*Id.* at 108.) In order to avoid hitting this post with the trailer of his truck, Lloyd testified, he was required to perform a "fishhook" turn, that is, to drive his truck directly east into the intersection before turning the truck south onto Des Plaines. (*Id.* at 108.) Although he was concerned about the post, Lloyd nevertheless focused his main concern on the area where he planned to turn. (*Id.*

8

at 117.) Lloyd saw no pedestrians standing on the southwest corner of the exit ramp and Des Plaines Avenue, while he was waiting for the light to change, nor did he see any pedestrians as he was executing his fishhook turn. (*Id.*) Lloyd stated that he always anticipates the possibility that pedestrians will be in the area and that if he had seen one, whether standing up or lying down, he would have stopped the truck. (*Id.* at 114.) Lloyd claims that he followed "established procedure" in making the turn, checking his mirrors, using the turn signal, and surveying the entire area of the intersection, looking from left to right. (*Id.* at 105.) Lloyd testified that he maintained a lookout for pedestrians; that his maximum rate of speed during the turn was seven miles per hour; and that he had his foot over the brake throughout the entire turn. (*Id.* at 122.)

As he was completing the turn, Lloyd testified that he felt a bump and knew something was wrong. (*Id.* at 118.) Lloyd denies hearing a car horn or seeing flashing lights, nor does Lloyd remember anyone beating on the side of his door after he made the turn, but soon after completing it, he heard someone yell that "there is someone under your truck." (*Id.* at 121.) Lloyd stopped the truck promptly and found Sheehan lying underneath the left side of the trailer.[6] (*Id.* at 121.) He immediately went back to the cab of the truck and called 911. (*Id.*)

The police issued no traffic citations as a result of this accident. (*Id.*) In fact, at the time of trial, Lloyd was the recipient of 14 safe driving awards from the National Safety Council, including an award for his safe driving in 1999. (*Id.* at 133.) Lloyd was not reprimanded in any way by the postal service following the accident, but he has not driven a truck since the accident and instead took another job with the post office. (*Id.* at 136.) Lloyd gave up truck driving after the accident because he was concerned that no matter how safely he was operating his truck, something bad could happen. (*Id.*)

---

[6]     According to Lloyd, there was no evidence that any part of Sheehan's body had come into contact with his postal truck. (T.T. at 131.) Lloyd even suspected that Sheehan may have been hit by another vehicle. (*Id.* at 132.) As explained above, however, Defendant does not dispute that Sheehan's injuries were sustained when he was hit by the postal truck driven by Lloyd.

9

**Investigation of the Accident**

John Scott, a police sergeant with the Village of Forest Park, was assigned to investigate the accident involving Sheehan. (*Id.* at 32.) Scott was certified as an accident investigator in 1977, the year he joined the Forest Park Police Department, and has investigated nearly 1,000 accidents since then, 100 of which involved fatalities. (*Id.* at 36.) Although Scott was trained in accident investigation and accident reconstruction, he considers himself an expert only in accident investigation, and explained that his expertise includes determining the point of impact, the energy involved in an accident, speeds, skid functions, physical drag, and friction. (*Id.* at 34.)

Scott was familiar with the intersection because he lived nearby and frequently traveled through it. (*Id.*) He explained that trucks regularly travel though this intersection after exiting the I-290 expressway and turning south on Des Plaines Avenue en route to the bulk mail center. (*Id.* at 35.) In Scott's view, the intersection was unsafe because its configuration required trucks to make a turn sharper than 90 degrees from the I-290 exit ramp south onto Des Plaines Avenue. (*Id.* at 67.) Regular pedestrian traffic from the nearby El station further complicates the intersection. (*Id.* at 35.)

The initial call to police regarding the accident was received at 2:17 p.m., and Scott arrived at the scene approximately 20 to 30 minutes later. (*Id.* at 39.) When he first arrived, the truck had not been moved and was standing approximately 100 feet south of the intersection, between the two southbound lanes. (*Id.* at 67.) Scott learned that Sheehan had been taken to the hospital, but he noted a pool of blood and debris beneath the truck, where Sheehan had come to rest after being dragged by the truck. (*Id.*)

Although there is no painted crosswalk where Sheehan was crossing, Scott characterized the path he followed as an "unmarked crosswalk" that runs at a sixty to seventy degree angle from the southwest corner of the exit ramp and Des Plaines Avenue to the southeast corner of Des

Plaines (created by the intersection of Dunlop Street and Des Plaines Avenue). (*Id.* at 52.) The existence of this unmarked crosswalk is confirmed, in Scott's view, by the fact that both corners feature cut curbs, allowing a wheelchair to be pulled up or down from the sidewalk to the street. (*Id.* at 41.)

Scott found hair on the left front tire of the tractor and the two front left tires of the trailer. (*Id.* at 54.) Sheehan's hat was found almost exactly where the two center yellow lines of Des Plaines Avenue meet the white stop line for northbound traffic on Des Plaines Avenue. (*Id.* at 52.) Sheehan's glasses were lying south of the hat, just south of the stop bar. (*Id.*) Scott also found Sheehan's blood splattered in both the southbound and northbound lanes of Des Plaines Avenue and on the double yellow lines that divide the two lanes. (*Id.* at 47.) The location of the blood demonstrated, according to Scott, that at the time of the initial impact, Sheehan was in the unmarked crosswalk area crossing from corner to corner rather than in the middle of the block. (*Id.* at 48.) According to Scott, the location of the blood on the double yellow lines indicates that Sheehan was first hit by the truck while he was north of the stop bar. (*Id.* at 56.)

On cross examination, however, Scott admitted that his opinion regarding the point of impact, supported by the blood splatter south of the stop bar, was developed with the belief that Sheehan was standing when he was hit by the truck. (*Id.* at 66.) Scott acknowledged, further, that he found no evidence that Sheehan was struck by the front of the truck and that although he himself was the officer responsible for issuing tickets related to the accident, he issued no tickets. (*Id.* at 69.)

William E. Travis, the Supervisor of Transportation for the United States Postal Service, went to the accident scene on November 2, 1999 to gather information. (*Id.* at 139.) As supervisor, Travis was responsible for monitoring his drivers and their schedules, dispatching, and investigating accidents. (*Id.* at 139–40.) Prior to becoming a supervisor, Travis drove a truck for the postal

11

service. (*Id.* at 139.) Although Travis is a certified accident investigator by the United States Postal Service, he did not draw any conclusions regarding Lloyd's accident or attempt to determine the point of impact. (*Id.* at 140-41, 157.)

According to Travis, the flat windshield truck that Lloyd was driving has a "blind spot" on the right side of the truck, approximately one foot in size. (*Id.*) In addition, Travis stated that the truck has a "very small" blind-spot directly in front of the truck that is roughly 6 inches to 2 feet in size. (*Id.* at 146-47.) Travis added that the windshield in Lloyd's truck dipped down to reduce the blind spot in front. (*Id.* at 148.) Travis does not believe that weather conditions contributed to causing this accident, nor did the visual obstructions at the corner, such as the fence and bushes. (*Id.* at 156.)

Travis himself was familiar with the intersection, having traveled through it many times before November 2, 1999. (*Id.* at 142.) Like Demetrius Brass, Travis had observed pedestrians crossing near the southwest and southeast corners of the intersection, despite the absence of a designated crosswalk. (*Id.* at 143.) On a diagram that he developed as part of his review of the accident scene, Travis drew dotted lines across Des Plaines Avenue to illustrate the area in which pedestrians frequently cross. (*Id.* at 150, 156.) The dotted lines of the diagram depict a pedestrian path perpendicular to Des Plaines Avenue, north of the stop bar, rather than a diagonal path from corner to corner. (*Id.* at 143; Plf.'s Ex. 100.) Travis acknowledged that pedestrians frequently cross in this area, but he believes these pedestrians are "jaywalking." (*Id.* at 148.) Travis did not draw any conclusions regarding the cause of the accident, (*id.* at 158), nor did he testify regarding the actual path taken by Sheehan.

Travis is not familiar with the legal definition of an unmarked crosswalk, (*id.* at 161), but from his own driving experience, Travis acknowledged that a driver would always anticipate someone crossing the street on foot and would always be responsible for observing pedestrians

in front of the truck or in the truck's path. (*Id.* at 143.) According to Travis, the proper procedure for a truck driver making the turn is first to examine the intersection to insure that it is clear of both pedestrians and vehicles, by looking right, forward, left, and then right again before making the turn. (*Id.* at 142-43.)

Travis knows Lloyd to be a courteous and conscientious driver who obeyed traffic laws. (*Id.*) In fact, in Travis' opinion, Lloyd was a better driver than the rest of the drivers he supervised, including himself. (*Id.*) In a conversation soon after the accident, Lloyd told Travis that his speed during the turn never exceeded 3 to 5 miles per hour. (*Id.* at 144.) Travis estimated that making the turn at that speed would have taken approximately 20 to 25 seconds. (*Id.* at 145.)

**Expert Testimony**

Each side retained an accident reconstruction expert. Plaintiff's expert, Steve Jackson, works full time as a consultant in his own accident reconstruction business. (*Id.* at 167.) Jackson was retained by Plaintiff in April 2001 and has reviewed the relevant documents in the case, including deposition testimony, police reports, and photographs of the accident scene and of the truck Lloyd was driving at the time of the accident. (*Id.* at 173.) Jackson referred to truck as a "full view tractor," meaning that it has more glass in front, on the passenger side, and in the back, providing greater visibility than a typical tractor. (*Id.* at 202.) Specifically, the passenger side has a bigger window than a typical tractor and includes another window in the passenger side door, closer to the ground, for greater visibility. (*Id.* at 203; Plf.'s Ex. 84.)

Jackson characterized the intersection as "fairly complicated" with a "wagon wheel style"; that is, the I-290 exit ramp, Harrison Street, Des Plaines Avenue and Dunlop Street all feed into the same intersection. (TT. at 173.) The intersection is further complicated by the fact that the I-290 exit ramp meets Des Plaines Avenue at a 70 degree angle. (*Id.* at 180.) Jackson created a diagram of the intersection, deliberating distorting the diagram to make it appear as if the turning

13

angle were a full 80 degrees. (*Id.* at 180.) Jackson explained that this distortion gives the benefit of the doubt to the driver; at a turning angle greater than 70 degrees, the driver could utilize "full and sustained acceleration" and complete the turn more quickly, with less time to observe and avoid a pedestrian. (*Id.* at 179-80.)

According to Jackson's calculations, the truck traveled 135 feet from the stop line on the ramp to the point of impact on Des Plaines Avenue (near where the double yellow lines meet the stop bar for northbound traffic on Des Plaines Avenue). (*Id.* at 181, 183.) Jackson calculated that it would take the truck 12.9 seconds to travel from its position on the exit ramp to the point of impact. (*Id.* at 191.) Limited physical obstructions would have interfered with Lloyd's view of Sheehan, according to Jackson; neither the bushes adjacent to the exit ramp, which lacked foliage at the time, nor the chain link fence adjacent to the exit ramp and Des Plaines Avenue presented an impediment to Lloyd's vision. (*Id.* at 183.) To test visibility, Jackson asked an assistant (Jackson's son) to stand at different points on Des Plaines Avenue, while Jackson himself stood on the exit ramp. (*Id.* at 185.) From each of several different points on the exit ramp, Jackson was able to see his son through the fence. (*Id.*) At the time of the accident, Jackson noted, Lloyd was seated seven feet high in the tractor of the postal truck, which would allow him to see over the six-foot fence. (*Id.* at 183.) Jackson did acknowledge that the light posts on the corner could have obstructed Lloyd's vision, but any vision impediments would have been "short lived," in Lloyd's view, because anything behind the posts would become visible once the truck started to move forward to execute the turn. (*Id.* at 183, 186.)

Using the standard acceleration and deceleration factor, or stopping factor, for a semi truck, Jackson determined that the truck could have reached a speed of up to 14 miles per hour in traveling the 135 feet prior to the point of impact. (*Id.* at 192-93.) If Lloyd had reached a speed of 14 miles per hour, he could have stopped the truck in three seconds, including the time it would

14

take him to recognize the hazard, move his foot to the brake and skid to a stop. (*Id.* at 194.) At a slower speed, it would have taken him less time; for example, if Lloyd executed the turn at a speed of seven miles per hour, 16.5 seconds would have elapsed from start to the point of impact. (*Id.* at 196, 207.) According to Jackson, at either the greater or lesser speed, Lloyd had enough time to observe Sheehan and brake before hitting him. Further, if Lloyd had his foot over the brake the entire time as he testified, Jackson stated this would reduce his stopping time by as much as half a second. (*Id.* at 196-97.)

Jackson also calculated the time it would have taken Sheehan to travel on foot from the curb to the point of impact. (*Id.* at 189.) Using a standard walking speed for a male of 60-plus years of age, approximately three miles per hour, it would have taken Sheehan five seconds to walk from the curb to the point of impact. (*Id.* at 206.) For the entire five seconds that Sheehan was walking across the street, according to Jackson, Sheehan was in Lloyd's line of vision and Lloyd had enough time to bring the truck to a complete stop, to avoid hitting Sheehan. (*Id.*) Further, Jackson opined that Sheehan had the right-of-way at the intersection at the time of the occurrence because he had the light and was attempting to cross Des Plaines Avenue in what Jackson referred to as an "unmarked crosswalk," that is, the area directly in front of the stop line for northbound traffic on Des Plaines Avenue. (*Id.* at 203-04.)

The "fishhook turn" is not consistent with any standard turning radius, but would actually require more time to execute because it is a more complicated turn, giving the driver even more time to observe a pedestrian. (*Id.* at 189.) On cross examination, Jackson acknowledged that when a truck driver is making such a difficult maneuver, however, the driver is more apt to give his full attention to the turning process, which includes where the trailer is during the course of the turn. (*Id.* at 213.) In addition, Jackson stated that the end of Lloyd's turn was a critical time because Lloyd had to make certain that the trailer wheels did not make contact with the light post. (*Id.* at

217.) Jackson also acknowledged that a moving object is more easily seen than a stationary object, such as Sheehan lying on the ground. (*Id*. at 218.)

Defendant's expert, Michael Rogers, works as a licensed engineer for Packer Engineering. (*Id*. at 236-27.) Rogers is a state-certified accident reconstruction expert who has performed approximately 600 to 800 accident reconstructions during the past 17 years. (*Id*. at 237.) Rogers prepared a number of different diagrams illustrating the accident scene. (*Id*. at 240.) Rogers testified that his diagrams are drawn to scale and are totally accurate, (*id*. at 243), apart from the fact that they do not depict a fishhook turn and instead assume a more uniform turning radius. (*Id*. at 264.)

Rogers identified a number of obstructions to Lloyd's view of Sheehan from the truck's position on the exit ramp waiting for the light to change. (*Id*. at 241.) These impediments include the street light post (Light Post C), the traffic light posts (Traffic Lights A and B), the chain link fence (Fence D), and the truck's side mirror. (*Id*. at 241-42.) Rogers acknowledged that once Lloyd began making the turn, there were no obstructions to his visibility, but he pointed out that the truck driver still has a number of things to concern himself with after starting the turn, including traffic coming from other directions and making sure the trailer does not hit the light post on the corner. (*Id*. at 258-59.)

Similar to Jackson, Rogers noted that Lloyd's right turn was particularly challenging because it was sharper than 90 degrees. (*Id*. at 244.) Rogers questioned Jackson's assumption that the truck made the entire turn using a constant 14 degree turning radius. (*Id*. at 244-45.) Although Rogers did not diagram the turn as a fishhook turn, he observed that rather than turning immediately into a 14 degree angle, the truck driver at this intersection must actually pull out straight in order to provide the trailer enough room to make the turn and clear the corner. (*Id*.) Then after providing this needed space, the driver must make a much sharper turn before

16

straightening out at the end of the turn. (*Id.*) Thus, the angle of the turn, according to Rogers, is constantly changing. (*Id.*)

According to Rogers' calculations, Lloyd traveled approximately 121 feet from the position of the truck on the exit ramp to the point of impact. (*Id.* at 246.) Assuming that the truck accelerated at an average acceleration rate up to a rate of speed of 13 miles per hour, it would have taken Lloyd 13 seconds to travel the 121 feet. (*Id.*) It is impossible to determine the actual rate of acceleration, but Rogers explained that it is typical in accident reconstruction to assume a constant rate of acceleration over some known distance. (*Id.*) Rogers agreed with Jackson that it would have taken Sheehan five seconds to travel on foot from his position on the curb to the point of impact. (*Id.* at 256.) Rogers stated, further, that if Sheehan had not fallen down, he would have safely crossed Des Plaines Avenue. (*Id.* at 259.) Rogers estimated that Sheehan could have crossed the street in ten seconds; thus, had he not fallen, Sheehan would have crossed Des Plaines Avenue safely. (*Id.* at 259-60.) Finally, Rogers estimated that if the truck was traveling seven miles per hour, as Lloyd testified, it would have taken Lloyd 24 seconds to complete his turn, thus providing Lloyd with more time to observe Sheehan before the point of impact. (*Id.* at 266-67.) At 10 miles per hour, Lloyd would have completed the turn in 18 seconds with a stopping time of 2.8 seconds. (*Id.* at 267-68.) Rogers testified, further, that if Lloyd in fact kept his foot over the brake as he was making the turn, the stopping time would also be reduced, although only by a small percentage. (*Id.*)

Rogers determined that the last moment that Lloyd could have seen Sheehan and still reacted in time to avoid hitting him was 38 feet from the point of impact. (*Id.* at 250.) According to Rogers, it is unclear how far the truck was from Sheehan when Lloyd first could have seen him but Rogers did acknowledge that it was more than 38 feet and that Lloyd could have seen Sheehan at some point during the turn. (*Id.* at 249, 250-51.) Rogers nevertheless does not believe that

Lloyd *should* have seen Sheehan because Lloyd was still trying to clear the curb and was concerned with the curb, with avoiding the lamp post, and with other traffic, as well. (*Id.* at 253.) Rogers acknowledged, however, that the obstruction to Lloyd's view only lasted for the early part of the turn and that once the truck was out in the street, Lloyd's view was no longer obstructed. (*Id.* at 262.) Thus, Lloyd had an opportunity to observe Sheehan from the start of the turn, until the point of impact, which includes the period of time that Sheehan was walking. (*Id.* at 261.)

### DISCUSSION

The court has jurisdiction over this lawsuit pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et seq.* The FTCA was "designed primarily to remove the sovereign immunity of the United States from suits in tort, and with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States*, 369 U.S. 1, 6 (1962). Suits brought under FTCA are governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Accordingly, this wrongful death action is governed by the law of the state of Illinois.

Under Illinois law, Plaintiff may recover if he can demonstrate that the United States, acting through Lloyd, was negligent and that this negligence was the proximate cause of Sheehan's injuries and death. 740 ILCS §180/1. The court will also consider Sheehan's negligence because under Illinois law, his fault must be compared against the fault of Lloyd in causing his own death and recovery is reduced by this percentage of fault, if any exists. 735 ILCS § 5/2-1116(c). In the event Sheehan is more than 50 percent responsible for the accident, he is barred from any recovery. *Id.*

Both sides agree that under Illinois law, a driver has a duty to maintain a proper lookout for pedestrians and a duty to exercise reasonable care in operating the vehicle in such a manner as to avoid pedestrians. *Alexander v. Yellow Cab Co.*, 241 Ill.App.3d 1049, 1054, 609 N.E.2d 921,

924 (1st Dist. 1993); *Joseph v. Schwartz*, 96 Ill.App.3d 749, 754, 422 N.E.2d 35, 39 (1st Dist.

1981); *Zeller v. Durham*, 33 Ill.App.2d 273, 278, 179 N.E.2d 34, 37 (2nd Dist. 1962). Similarly, a

pedestrian has a duty to conduct himself in a manner that is "free from contributory negligence."

*Zeller*, 33 Ill.App.2d at 278, 179 N.E.2d at 37. Whether or not either of the parties was negligent

is a question of fact. *Id.*

As stated previously, Defendant does not dispute that the truck Lloyd was driving caused

Sheehan's death and that Plaintiff can recover if he can demonstrate that Lloyd was negligent in

making the turn. (D.F. ¶ 132.) Plaintiff claims that Lloyd is negligent because he had both an

opportunity to observe Sheehan either before or after he fell and the time to stop prior to making

contact with Sheehan. In failing to observe Sheehan, Plaintiff claims, Lloyd breached his duty to

look out for pedestrians and operate his vehicle in such a manner as to avoid pedestrians.

Although Defendant acknowledges that Lloyd could have observed Sheehan either while

stopped on the exit ramp or during the turn, it argues that his failure to observe Sheehan was not

unreasonable under the circumstances. (D.F. ¶ 133.) Defendant argues, first, that Lloyd could

not see Sheehan, standing south of the traffic light on Des Plaines Avenue, while driving down the

exit ramp or while he was stopped at the traffic light because Lloyd's view was obstructed by three

posts and a chain link fence. Once Lloyd pulled into the intersection to make his turn, these

physical obstructions were no longer an impediment to Lloyd's vision, (D.F. ¶ 137), but Defendant

Lloyd had a number of other concerns: avoiding traffic from Harrison, avoiding southbound and

northbound Des Plaines Avenue traffic, clearing the post in the southwest corner of Des Plaines

Avenue and the exit ramp, and aligning his truck for the turn. In addition, the nature of Lloyd's turn

made it difficult for him to observe Sheehan lying in the street because Lloyd pulled forward first

and by the time he turned the tractor to the right, Sheehan was already lying prone on the ground.

Given these circumstances, Defendant argues that it was "less unreasonable" that Lloyd failed to

observe Sheehan. (D.F. ¶ 144.)

The court notes, first, the troublesome configuration of the intersection at issue in this case. A driver turning south onto Des Plaines Avenue from the exit ramp must execute a much sharper turn than is typical. The driver of a semi truck must be cautious to avoid making contact with the post at the corner of Des Plaines Avenue and the exit ramp. This already difficult task is further complicated by the fact that this intersection experiences heavy pedestrian traffic from the nearby El station and regular vehicle traffic traveling in four different directions.[7] Regardless of these difficulties, however, Lloyd owed a duty to Sheehan and other pedestrians to keep a lookout and operate the truck in a manner that would allow him to avoid pedestrians. In examining all of the obstructions to Lloyd's vision while he was stopped on the exit ramp, the court agrees with Defendant that it was not unreasonable that Lloyd failed to see Sheehan while he waited on the exit ramp for the light to change. Sheehan was south of the traffic light and Lloyd's view was blocked at that time by the fence and three posts.

Both expert witnesses, Jackson and Rogers, agree, however, that the posts and the fence were no longer a problem for Lloyd once he started to drive forward in making his turn. Both agree, further, that it took Lloyd approximately 13 seconds from the start of his turn to the point of impact. For five of these seconds, Sheehan was walking across the street prior to falling down. Although it is much more difficult to see a pedestrian lying on the ground than standing up, the evidence reflects that Lloyd had an opportunity to see Sheehan in both positions. The court notes, further, that Jackson and Rogers agreed that it would have taken Lloyd approximately three seconds to react and stop the truck, after seeing Sheehan in the road. These estimates provide Lloyd with

---

[7]     The difficulties for truck drivers posed by this intersection has not dissuaded them. Several witnesses testified that trucks regularly make this turn on the way to the bulk mail center. In light of the high volume of pedestrian traffic and the high volume of truck traffic at this hazardous intersection, the court would hope the intersection will be re-examined and modified for the safety of both pedestrians and drivers.

approximately nine seconds, from when he started the turn, to observe Sheehan and stop his truck before making contact. This nine second window of time only gets larger if Lloyd was, as he testified, actually performing the more intricate fishhook turn and was traveling no faster than 7 miles per hour. The court concludes that this time frame provided Lloyd with a brief but sufficient opportunity to see Sheehan either walking or lying on the ground. As a result, the court finds that Lloyd breached his duty to Sheehan when he failed to see Sheehan in the road and stop his truck before making contact. The conclusion that Lloyd was negligent in making the turn that resulted in Sheehan's death is bolstered by the evidence that Lloyd was unaware he had hit Sheehan until Brass stopped him.

The court turns, next, to the issue of Sheehan's negligence. Defendant argues that Sheehan was negligent because he failed to exercise ordinary care for his own safety while crossing Des Plaines Avenue. *Albaugh v. Cooley*, 87 Ill.2d 241, 249, 429 N.E.2d 837, 840 (1981). This standard is applied based on the facts of each case, and Defendant has the burden of demonstrating Plaintiff's negligence. *Id.*; *Patel v. Brown Mach. Co.*, 264 Ill.App.3d 1039, 1053, 637 N.E.2d 491, 500 (1st Dist. 1994). Specifically, Defendant argues that Sheehan was negligent because he did not cross in a marked crosswalk area, because he failed to select a safer means available for crossing the street, and because he fell while crossing the street. Plaintiff, on the other hand, argues that Sheehan was in or near an unmarked crosswalk at the time of the accident and as a result had the right of way. Even if Sheehan was not in or near a crosswalk, however, Plaintiff argues that Sheehan had the right of way and Lloyd was required to yield to Sheehan in the roadway.

Whether or not a crosswalk existed and whether Sheehan was in the crosswalk at the time Lloyd made contact with him is relevant because under Illinois law a pedestrian in a crosswalk has the right of way and vehicles are required to yield to pedestrians in crosswalks. 625 ILCS § 5/11-

1002. In the event a pedestrian is crossing a street outside of a crosswalk area, the pedestrian is required, under Illinois law, to yield to the vehicles in the roadway. 625 ILCS § 5/11-1003. The parties dispute, first, whether an unmarked crosswalk existed between the southwest and southeast corners of Des Plaines Avenue and, in the event one existed, whether Sheehan was in the crosswalk area when Lloyd make contact with him.

There is no dispute that a marked crosswalk–defined as "any portion of the roadway distinctly indicated for pedestrian crossing by lines or other markings," 625 ILCS § 5/1-113–did not exist where Sheehan was attempting to cross Des Plaines Avenue. Both sides agree, however, that an unmarked crosswalk can exist in the absence of painted lines. Under Illinois law, an "unmarked" crosswalk is defined as "[t]hat part of a roadway at an intersection included within the connections of the lateral lines of the sidewalks on opposite sides of the highway . . . and, in the absence of a sidewalk on one side of the highway, that part of the highway included within the extension of the lateral line of the existing sidewalk to the side of the highway without the sidewalk, with such extension forming a right angle to the centerline of the highway." *Id.*

This statutory definition of an unmarked crosswalk is of little help here. The court notes that sidewalks are in place adjacent to both sides of Des Plaines Avenue and Dunlop Street. As stated previously, however, Dunlop is an angled street. If the lateral lines of the sidewalk on Dunlop street (where it intersects with Des Plaines Avenue to form the southeast corner of the intersection) were extended to create a crosswalk, as required by the statute, it would run from the southeast corner of Des Plaines Avenue to the northwest corner of Des Plaines Avenue and the exit ramp. Although this may be proper under the statute, such a crosswalk would be unwise and unreasonable because it would require a pedestrian to cross Des Plaines Avenue and the exit ramp at the same time. In addition, to construe the crosswalk as running perpendicular to Des Plaines Avenue is also inappropriate under the statute. The statute requires a perpendicular crosswalk only in the

22

absence of a sidewalk. As stated previously, sidewalks are in place on both sides of Des Plaines Avenue.

Finding the statutory definition of little use here, the court turns to the testimony in the case. Scott stated that he believed an unmarked crosswalk existed, running on an angle between the southwest and southeast corners of the intersection. He noted the cut curbs on both sides to make them wheelchair accessible. Such a crosswalk would be the most practical because it would run from the corner of Des Plaines Avenue to the southeast corner of Des Plaines Avenue. This path would provide motorists with the best chance to observe pedestrians prior to their crossing the roadway because pedestrians would wait at the corner of the intersection. In addition, the court notes that a number of witnesses testified that pedestrians regularly cross the intersection in this manner. As a result, the court finds that an unmarked crosswalk does in fact run on an angle from the southwest corner to the southeast corner of the intersection.

Although an unmarked crosswalk existed in this portion of the intersection, the court concludes that Sheehan was not in this path when he attempted to cross Des Plaines Avenue on the day of the accident.[8] Instead, the evidence demonstrates that Sheehan started to cross Des Plaines Avenue south of the stop light on the west side of Des Plaines Avenue. As he crossed, Sheehan walked at a slight angle before he fell, even with or just north of the stop line for northbound traffic. This places Sheehan south of the unmarked crosswalk when Lloyd first made contact with him. Because Sheehan started well south of the corner, the only crosswalk he could have been walking in at the time of the accident would have run perpendicular with Des Plaines Avenue, running directly in front of the stop line. Such a path would have been inconsistent with

---

[8]     Officer Scott testified that he believed Sheehan was crossing in the unmarked crosswalk when he was hit by the postal truck, but Scott's finding was based on the inaccurate assumption that Sheehan was standing (walking from corner to corner) when he was hit by the postal truck.

the Illinois statute and arguably unsafe because it would have pedestrians standing well south of the corner on the west side of Des Plaines Avenue waiting to cross, rendering them less visible to east-bound drivers.

The court's determination that Sheehan was crossing Des Plaines Avenue outside of an unmarked crosswalk does not by itself require a finding that Sheehan was negligent. Illinois courts have held, instead, that whether a pedestrian crossing the roadway at a point other than a marked crosswalk exercised due care remains a question of fact. *Trennert v. Coe*, 4 Ill.App.2d 166, 170, 124 N.E.2d 79, 81 (2nd Dist. 1955); *King v. Ryman*, 5 Ill.App.2d 484, 125 N.E.2d 840 (2nd Dist. 1955); *Crowley v. Sidey*, 11 Ill.App.2d 577, 138 NE.2d 90 (1st Dist. 1956). These old but still valid cases are consistent with a more current jury instruction used and approved by Illinois courts. In cases such as the one before this court, Illinois juries are instructed that a pedestrian crossing a roadway in an unmarked crosswalk shall yield the right-of-way to all vehicles in the roadway; but every driver must nevertheless exercise care to avoid a collision, must sound the horn when necessary, and must exercise precaution when observing an incapacitated person. Illinois Pattern Jury Instructions, Civil 70.03; *see Grossman v. Gebarowski*, 315 Ill.App.3d 213, 732 N.E.2d 1100 (1st Dist. 2000).

After reviewing all of the evidence related to this accident, the court finds that Sheehan was in fact negligent in deciding to cross Des Plaines Avenue in an area outside of the unmarked crosswalk. Specifically, Sheehan breached his duty of care by crossing the street south of the traffic light rather than at the southwest corner of Des Plaines Avenue and the exit ramp. Sheehan would have been in the crosswalk area if he had started to cross the street from the corner of the intersection rather than farther south on Des Plaines Avenue. This path would have made it more likely that Lloyd would have seen Sheehan as he crossed the intersection. The court concludes, however, that Sheehan's negligence does not bar him from any recovery. First, a number of

24

witnesses including Lloyd testified that it was common to observe pedestrians crossing in the manner used by Sheehan, starting south of the stop light on Des Plaines Avenue to cross to the east side of Des Plaines Avenue. The court notes, next, that when Lloyd initially started his turn, he pulled forward rather than straight. Sheehan could well have construed this motion as an indication that Lloyd was going straight ahead rather than making a right hand turn, giving Sheehan the right of way. Lastly, as stated above, Sheehan was visible to Lloyd once he started his turn. The court concludes Sheehan's negligence renders him twenty percent (20%) responsible for this accident and will reduce its award of damages by this amount only.

Defendant also argues that Sheehan was negligent in not selecting a safer route to Dunlop Street that would have allowed him to cross entirely through marked crosswalks. *Klimovich v. Crutcher*, 57 Ill.App.2d 444, 451, 206 N.E.2d 723, 727 (1st Dist. 1965) (pedestrian can breach his or her duty of care by failing to utilize a safer route to cross a street). The court rejects this argument. As noted, an unmarked crosswalk did exist in the area of the intersection just north of where Sheehan crossed Des Plaines. Although Sheehan's path ran further south, its proximity to the unmarked crosswalk suggests his failure to take the far longer course (on paved sidewalk) does not by itself constitute negligence.

Finally, Defendant argues that Sheehan was negligent because he fell while attempting to cross the street and thus did not execute ordinary care in crossing the street. Both experts agree that if Sheehan had not fallen in the street, he would have safely crossed the street before Lloyd reached the point of impact. Specifically, according to both expert witnesses, it would have taken Sheehan approximately 10 seconds to cross from one side to the other, while it took the truck approximately 13 seconds to reach the point of impact. Absent the fall, Sheehan would have safely crossed the street; at a minimum, remaining on his feet would have rendered Sheehan more visible to Lloyd or arguably able to see Lloyd's approach in time to return to the curb and avoid

being hit. Still, the court is reluctant to find that Sheehan's fall bars any recovery. No evidence was offered as to what caused Sheehan to fall. In any event, Defendant has not presented any statutory authority or case law that would support the argument that a pedestrian breaches his of her duty of care simply by falling down.

**Damages**

The loss of John Sheehan has been a tremendous hardship for his wife, his children, and the rest of his family. A monetary remedy never truly compensates for the injury or loss of a loved one. This type of award, however, is the only one available to the court, and the court must therefore consider the arguments on both sides regarding damages.

Both sides agree that "surviving heirs or next of kin . . . are entitled to recover for the pecuniary losses incurred as a result of the death, including money, benefits, goods, services, and society. Although those damages do not include grief or mental anguish resulting from the death, damages for loss of society are recoverable, which include the deprivation of love, companionship, and affection from the deceased person." *Turner v. Wilson*, 326 Ill.App.3d 541, 548, 762 N.E.2d 70, 77 (2nd Dist. 2001). No award for lost wages will be made here because no evidence other than the fact that Sheehan had a job was offered into evidence.

Instead, Plaintiff seeks damages for loss of society, pain and suffering, and loss of consortium. He proposes a total award of $6 million; $2.5 million for Sheehan's wife and $500,000 for each of Sheehan's seven adult children. (Plf.'s Submission of Comparable Verdicts and Settlements, (hereinafter, "Plf.'s Submission"), at 1.) Defendant, on the other hand, has suggested a total verdict of $950,000 for Sheehan's family; $250,000 for his wife and $100,000 for each of his children. (D.F. ¶ 165.)

In *Jutzi-Johnson v. United States*, 263 F.3d 753, 758-59 (7th Cir. 2001), the Seventh Circuit considered a Federal Tort Claims Act case and concluded that courts should examine the

resolution of similar cases when determining the value of pain and suffering to limit "arbitrary variance in awards." *Jutzi-Johnson* involved the use of comparable verdicts in determining an appropriate award for pain and suffering; the loss of society, as claimed here, is analogous due to its intangible nature. Thus, the court will review recent awards in cases similar to this one. To assist in this process, both sides have submitted a number of verdicts they consider comparable.

Among the cases cited by Defendant is *Cochrane v. Bejco Construction, Inc.* (tried 2001), in which a 58-year-old woman died as a result of the injuries she sustained after being run over by defendant's forklift. Cook County Jury Verdict Reporter, 97L-15445. Plaintiff was awarded $612,500, but this amount was reduced to $306,250 to reflect the decedent's 50 percent contributory negligence. The decedent was survived by her husband and three children. Although decedent's age and family circumstances are somewhat similar to those presented here, the marital relationship between decedent and her husband is quite different: In contrast to the relationship between Sheehan and his wife Lois, who were married for almost 40 years, decedent and her husband in *Cochrane* had been married for only one year. This marriage was the decedent's second marriage and her husband's fourth.

Defendant also cites *Smith v. New York Hospital* (tried 2001), 2001 WL 1137023 (LRP Jury), in which plaintiff filed a wrongful death claim in Bronx County, New York, resulting from the negligent placement of a catheter used as part of decedent's chemotherapy treatments for leukemia. Defendant denied liability because decedent's injury was a known risk in the catheter insertion procedure. Defendant noted, further, that decedent, then 62 years old, only had six months to live. The jury awarded $1,514,400 to decedent's surviving wife and six adult children. The court finds this verdict distinguishable because Sheehan was in good health at the time of his death and had a life expectancy of 18 years.

Defendant also cites *Utheim v. Western Pneumatics, Inc.*, 1989 WL 1100163

27

(JVRA.Nat.Jury), in which decedent, a 62 year old woman, married to her husband for 43 years and mother of seven children, was fatally injured when she was hit by a pick-up truck while crossing the street at an intersection in Aberdeen, Washington. In 1989, the jury awarded the decedent's estate $507,000, but plaintiff later entered a post-trial settlement agreement for $425,000. Although the facts of the case are plainly analogous, the court does not find this verdict instructive because the case is over ten years old and was decided in the state of Washington, which at the time had state law caps on damages well below the amount at which the case settled.

Plaintiff, first, cites *Christo v. Heilig Meyers Co.* (tried 2002), a wrongful death action filed in Cook County on behalf of the deceased's estate. Cook County Verdict Reporter 99L-8771. On July 10, 1998, the decedent, Thomas Christo, was driving in Chicago when he was hit by defendant's moving van, after the van had run a stop sign at approximately 40 miles per hour. Christo survived for two hours before he died as a result of his injuries. Defendant admitted liability, but it maintained that plaintiff, then 56, had a life expectancy of only two years because of his history of congestive heart failure, heavy smoking, hypertension, coronary artery disease, pulmonary disease and renal insufficiency. The jury returned a verdict for $2,506,000; of that amount, $2,070,00 was for loss of society to Christo's three adult children.

Although *Christo* is similar to this case in certain respects, the court finds *Russell v. Bethesda Lutheran Home*, 2002 WL 430538 (JVRA.Nat.Jury), more instructive. The *Russell* case, filed in Lake County, Illinois, arose from an accident caused when the defendant, who was reading a magazine while driving his car at 55 miles per hour, collided with a farm tractor driven by the decedent, who died six weeks later. At the time of his death, decedent was 62 years old and had a life expectancy of 17 years. He was survived by his wife and five adult children. The jury returned a verdict of $3,165,588.37 in favor of plaintiff. On the wrongful death count, the jury awarded the deceased wife $100,000 for loss of services, $2,000,000 for her loss of society, and

28

$100,000 for the loss of her husband's earnings. In addition, the jury awarded each of the decedent's four children $25,000 for loss of services and $125,000 for loss of society. On the survival count, the jury awarded the wife, as executor of the estate, $75,000 for decedent's conscious pain and suffering, $4,000 loss of earnings; $66,000 for the decedent's physical disability; $5,000 for his disfigurement; and $25,000 for her loss of consortium.

The victim in *Russell* was close in age and estimated life expectancy to Plaintiff Sheehan, who was 62 years old at the time of his death and had an estimated life expectancy of 18 years. Similar to the jury's award to the estate of Keith Russell, this court awards Sheehan's wife, Lois, $2,000,000 for her loss of society. The court awards an additional $25,000 for her loss of consortium. As stated earlier, the court will award no amount for lost earnings because no evidence of Sheehan's earnings were presented at trial. In addition, the court awards $150,000 to each of Sheehan's adult children for their loss of society.

The court recognizes that Sheehan's conscious pain and suffering was minimal when compared to that of Russell, who survived six weeks after the accident. In this case, Sheehan was conscious after the accident for only a few minutes. The accident took place at approximately 2:15 p.m. and it is undisputed that Sheehan was not responsive minutes later, when the paramedics arrived at the scene. Evidence was introduced, however, that after being run over by the truck, Sheehan was attempting to talk and get up from the road. Because this conscious pain and suffering was a fraction of that experienced by Russell, the court will reduce the award to reflect that difference. Thus, the court awards $10,000 to Plaintiff for Sheehan's conscious pain and suffering.

The total award to Plaintiff is $3,085,000. This amount is reduced, however, by the percentage of negligence of Sheehan in crossing the street south of the crosswalk. Thus, the adjusted final award to Plaintiff is $2,468,000.

## CONCLUSION

The court finds in favor of Plaintiff on his wrongful death claim and awards Plaintiff $3,085,000, reduced by twenty percent (20%) to $2,468,000 to reflect Sheehan's own responsibility: $1,600,000 for Mrs. Sheehan's loss of society; $20,000 for her loss of consortium; $8,000 for conscious pain and suffering and $110,000 for the loss of society to each of Sheehan's adult children).

ENTER:

Dated: August 8, 2003

REBECCA R. PALLMEYER
United States District Judge



Sidewalk H

Traffic Light B

Sidewalk G

Light Post C

Sidewalk F

Traffic Light A

Fence D

Sidewalk E